1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| ROGER SAESEE, | ) 1:08-CV-01152 OWW JMD HC |
| Petitioner, | ) FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ) |
| ROBERT A. HOREL, | ) |
| Respondent. | ) |

12
13
14
15
16
17

18    Petitioner Roger Saesee ("Petitioner") is a state prisoner proceeding pro se with a petition for

19  writ of habeas corpus pursuant to 28 U.S.C. § 2254.

20                              **PROCEDURAL HISTORY**

21    Petitioner is currently in the custody of the California Department of Corrections and

22  Rehabilitation at Pelican Bay State Prison, pursuant to a judgement of the Tulare County Superior

23  Court.  (Pet. at 2).   Petitioner was convicted by a jury in May 2006, of murder (Cal. Penal Code §

24  187) with sentence enhancements for intentional discharge of a firearm causing great bodily injury

25  (Cal. Penal Code § 12022.53(d), personal use of a firearm (Cal. Penal Code § 12022.5(a)(1), and

26  commission of the crime for the benefit of a gang (Cal. Penal Code § 186.22(b)(1)).   (Answer at 3;

27  Pet. at 2).   Petitioner was also convicted of shooting at an inhabited dwelling (Cal. Penal Code §

28  246) and of permitting another to shoot from a vehicle (Cal. Penal Code § 12034(b)).  (Answer at 3;

1   pet. At 2).  Petitioner was sentenced to life without the possibility of parole with a concurrent term of

2   twenty-five years to life.  (Pet. at 2).

3       Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District.

4   (Lod. Doc. 1).  The appeal raised five grounds for relief.  The appellate court issued a reasoned

5   opinion on October 31, 2007, rejecting those claims.  (Lod. Doc. 4).

6       On April 20, 2008, Petitioner filed a petition in the Tulare County Superior Court, raising

7   several claims that had not been presented on direct appeal.  (Lod. Doc. 15).  The Tulare County

8   Superior Court denied the petition on April 30, 2008.  (Lod. Doc. 16).

9       Petitioner subsequently filed a petition for writ of habeas corpus, raising the same claims

10  previously submitted to the Tulare County Superior Court, in the California Court of Appeal.  (Lod.

11  Doc. 5).  The California Court of Appeal summarily denied the petition on June 12, 2008. (Lod. Doc.

12  6).

13      Petitioner then submitted a petition for review to the California Supreme Court, raising the

14  five claims previously submitted on direct review to the appellate court. (Lod. Doc. 13).  The

15  California Supreme Court summarily denied the petition for review on February 20, 2008.  (Lod.

16  Doc. 14).

17      On August 19, 2008, Petitioner filed the instant federal petition for writ of habeas corpus

18  raising eight claims–five claims which had been previously raised on direct appeal and three claims

19  previously raised in writs of habeas corpus.

20      On January 16, 2009, Respondent filed a response to the petition.

21                    **FACTUAL BACKGROUND**[1]

22      ***The Murder***

23          Joe Fernandez, known as Lolo, lived in an apartment with his fiancée and their
       two children. Lolo associated with a Norteño gang and affiliated with the Mexican
24      Gangster Boys (MGB) subset. From the time Lolo and his family moved in, Lolo had

25

26      [1]These facts are derived from the California Court of Appeal's opinion issued on October 31, 2007.  (*See* Lod. Doc.
    4).  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is
27  presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1);
    *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *see also Sanders v. Lamarque*, 357 F.3d 943, 948 (9th Cir. 2004).
28  Here, Petitioner has not presented evidence that would permit the Court to set aside the presumption of correctness that has
    attached to the State court's factual findings.

problems in the neighborhood, particularly with defendant. People would pound on Lolo's door at night, threatening to come inside. On one occasion, someone attempted to kick open the door.

Defendant was an active member of the Oriental Troop (OT) gang, a vicious Asian Crip gang whose members commonly carried guns and identified themselves with the color blue. OT members had a long-standing rivalry with MGB members. OT members were known to despise MGB members, refusing to refer to them as anything but "fleas." Defendant would drive by Lolo's apartment two or three times a day in a white Honda hatchback and say, "Cripcuz," and flash a "C" with his hand. Lolo and his fiancée wanted to move out of the neighborhood, but they did not have enough money.

On the evening of November 15, 2004, about six months after Lolo and his family moved into the neighborhood, Lolo was murdered. The evening began as Lolo and his sister's boyfriend, Fernando, were preparing to barbeque with a neighbor outside the apartment. At the same time, Benny was in the neighborhood, walking to the Wittman Center. He saw Lolo and Fernando across the street barbequing. Benny wanted to meet Lolo because Lolo and Benny's stepson had been involved in a confrontation. Benny felt he had unfinished business with Lolo.

On an adjacent corner, Benny saw Anthony, an acquaintance, walking with his sister and two friends. Benny crossed the street and approached Anthony. Benny asked Anthony if he knew Lolo. Anthony was a Norteño gang member and he knew Lolo from around the neighborhood. When Anthony told Benny he knew Lolo, Benny asked if he would introduce him to Lolo. Anthony did not immediately agree; he asked Benny why he wanted to meet Lolo. Benny responded that Lolo had pulled a shotgun on his stepson and Benny wanted to talk to Lolo personally, as a gentleman, to see if he could resolve the problem. He said they had unfinished business and Benny was prepared to fight Lolo one-on-one, if necessary.

While this discussion was taking place, Benny's wife drove by to pick up another son from the Wittman Center. She saw Benny and asked him what he was doing there. He told her Lolo was the man who had pulled a gun on their son and Benny was going to confront him. She tried to convince Benny to go home, but he refused. She left, but returned a short time later. At that time, Benny could see Lolo talking on the telephone and Benny assumed he was calling for backup. Benny asked his wife to call her brother and son to come help him confront Lolo. Again, she urged Benny to go home and again he refused. She left and tried to find her brother and son, but when she could not, she called defendant, who was her cousin, and another Asian man to come help Benny...Benny had known defendant for several years and saw him almost every day.

While Benny and Anthony were standing on the corner with the other people, defendant and another Asian man rode up on bicycles. Defendant was wearing a blue sweat suit. He was tall and thin and the other Asian man was shorter. Defendant asked Benny what was going on. Benny told him, "That's the dude, Lolo, who pulled the gun on [my stepson]." Benny told defendant that Anthony was going to take him to confront Lolo. Benny asked defendant if he was "heated," meaning armed with a gun. Benny knew defendant was a gang member who usually carried a gun. Defendant answered affirmatively. Benny asked if he could take defendant's gun in case Lolo pulled out his shotgun. Although Benny was willing to die for his stepson, he would attempt to defend himself with the weapon. Defendant did not give Benny his gun. Instead, he said, "Don't trip." Benny told defendant he was not obligated to stay, but it was up to him. Defendant said, "Don't trip. I'll stay here."

Benny and Anthony walked across the street toward Lolo's corner. Lolo, who had been watching them, approached as they reached the corner. Anthony said to Lolo, "Hey, it's me. What's up?" They shook hands and Lolo responded, "Oh, what's up, homie? What's up, homie?" Benny introduced himself to Lolo as an "OG," which Benny intended to mean an older guy, and they shook hands. Lolo, however, was

distracted by the group behind Benny and Anthony. Benny said, "I have a question for you. I come here out of respect as a gentleman." Benny asked if there were any "fleas" in the area. Lolo was focused over Benny's shoulder on the people behind him. Defendant moved forward and stopped about two feet to Benny's left and the other Asian man, who was still on his bicycle, stopped about four feet to Benny's right.

Lolo recognized defendant immediately. As Benny attempted to engage Lolo in a conversation about the incident with Benny's stepson, Lolo angrily said, "Hey, that's the fool that shot at my house." Defendant responded, "Yeah, what's up." Lolo gestured with his hands and responded, "[W]hat's up guys? What do you want? ... [W]hat do you guys want to do? You guys want to jump me? You want to fight?" Lolo took off his shirt to fight and told them, "Let's go in the parking lot and handle it." Benny tried to redirect the conversation, but Lolo was focused on defendant. Lolo said he owned the block and this was his neighborhood. He said it was a Northern block. Defendant and the other Asian man countered that it was a Crip neighborhood and an Asian neighborhood. Lolo said, "Nah, you guys ain't-you ain't gonna do nothing. Get off my fuckin' block[.]" Defendant said, "This ain't your fuckin' block." Lolo turned to Benny and said, referring to him, "[W]hy is a northerner backing up OT's?" Benny told Lolo defendant was related to his wife. Lolo was angry and "started [a] little drunk talk." Then he said, "[F]uck OT, fuck [Crips]." At that moment, the Asian man on Benny's right, dropped the bicycle and cocked his gun. Within seconds, defendant also drew and cocked his gun, which Benny believed was a nine-millimeter weapon. Defendant and the other Asian man said, "[W]hat's up nigga, what's up nigga?" Lolo said, "[W]hat, you gonna shoot me? What, you guys gonna shoot[?]"

At that point, defendant shot twice at the ground in front of Lolo. Lolo turned around and ran, trying to dodge the bullets. Defendant shot at him at least seven times until he fell to the ground. Everyone except Benny ran from the scene. Benny did not feel he had to run because he "was there to do that." But when he realized some neighbors were going to jump the fence, he ran too.

A police officer was dispatched to the scene. As he approached, he observed Lolo lying face down on the sidewalk and grass. He had been shot in the back of his head and there was a large pool of blood under his head and torso. The officer spoke to Fernando, who described the perpetrators as two Asian and four Hispanic males. The officer broadcast the descriptions over the radio.

Lolo's neighbor had not gotten a good look at the shooter, but her daughter identified defendant from a photographic lineup two days after the crime. Four days after the crime, Fernando identified defendant and another Asian male from a photographic lineup. At trial, the neighbor testified the tallest man was the shooter. The neighbor's daughter testified the shooter was Asian, tall, thin and bald.

A criminalist examined five nine-millimeter cartridge cases and some bullet fragments. She concluded that all five cartridges were fired from the same gun.

The pathologist who performed the autopsy on Lolo testified Lolo had been shot seven times. The wound to the back of his head was fatal. Lolo had a blood alcohol concentration of 0.12 percent and his blood tested positive for a low level of methamphetamine.

In January 2005, the police contacted Benny. At first, Benny denied being involved or knowing anything about the crime because he was afraid for his life. After spending an hour in a holding cell, however, Benny decided to tell the truth so he asked to speak to the detective again.

Benny was arrested and charged with Lolo's murder. In February 2005, the district attorney offered him a deal. Ultimately, Benny agreed to a six-year maximum sentence for voluntary manslaughter in return for his truthful testimony. At the time of trial, Benny was in custody for Lolo's murder.

Benny testified he was a former gang member, affiliated with the South Side Locs of Hanford, but he had not been involved in a gang for eight years. According to

the police, Benny was a validated Norteño gang member and an associate of the OT. In Benny's opinion, defendant's killing of Lolo was gang related because of the words Lolo and defendant exchanged that night. Lolo was a Norteño (Benny heard Lolo so claim that night) and defendant was affiliated with the Crips, a predominantly Black gang. Benny testified he was still afraid for his life and the lives of his wife and children because his being a "snitch" put their lives in danger.

### The Drive-by Shooting

A witness testified that late one night, about three months before Lolo's murder, she witnessed a drive-by shooting. Defendant was driving a white hatchback car with three passengers. Defendant stopped the car abruptly in front of an apartment complex. The witness was driving right behind defendant and was forced to stop abruptly also. The witness saw someone in the front of defendant's car hand something to a passenger in the back, who then put a gun out the window and shot five times at the apartment building. The witness recognized defendant because he lived nearby and the witness saw him regularly in the neighborhood. The witness could see defendant's face in the rearview mirror and knew it was him. The witness reported the license plate number to the police.

The witness looked at a series of photos but did not see defendant. The next day, the witness attended a live line-up. The witness claimed to be able to identify the driver of the white vehicle. Defendant kept moving around, trying to make it difficult for the witness to identify him. The witness, however, knew it was him and told the officer that defendant was the driver of the white vehicle. The witness described "confusion" between the officers. One officer told the witness to be sure. The witness became irritated and told the officers to "just forget it."

In January 2005, an officer came to the witness's house and the witness immediately identified defendant from photographic lineups.

### Defense Evidence

A detective testified that on the night of the murder, Fernando identified Benny from a photographic lineup as the third suspect, the unknown Hispanic male adult. However, from a stack of about 50 photographs, Fernando thought someone named Jack Noi looked similar to the taller Asian suspect and Peter Saesee looked like the shorter Asian suspect. A young girl who was a witness to the murder identified someone other than defendant as the shooter from a photographic lineup and she failed to identify Benny from another photographic lineup.

About one week after the murder, at 2:00 a.m., a detective went to speak with a 13-year-old girl named Breanna. The detective asked about defendant and showed Breanna a photograph of him. Breanna told the detective she did not know who defendant was.

Defense Private Investigator Hallum read the police report stating that Breanna denied any involvement with defendant. Defendant, however, told Hallum he was with Breanna on the night of the murder. Hallum asked defendant to give him proof he was involved with Breanna by demonstrating he was familiar with her home. Hallum asked defendant to draw a diagram of Breanna's house. Hallum took defendant's diagram to Breanna's house, where he met Cindy, Breanna's cousin, who did not want to get involved. But when Hallum showed her the diagram and told her he was there to prove or disprove defendant's alibi, Cindy verified that the diagram was correct. Cindy showed Hallum Breanna's room and the notebook she had left behind.

Before the murder, Breanna had been living with her grandparents and Cindy. Breanna had her own bedroom, which she kept locked. Breanna testified she had been defendant's girlfriend for a couple of months before the murder. She was then 13

years old. Defendant would come to the house a few times every day when Breanna's grandparents were not at home. Defendant was not allowed in the house because Breanna's grandparents did not know him. Defendant would also sneak in the window and come into Breanna's bedroom. Breanna testified that she wrote, "RLOC was here, 11/10/04 RPC for life" on her furniture because she wanted to. She also wrote, "Breanna was here ... loving RLOC." She wrote, "RLOC was here" in her notebook. "RLOC" referred to defendant. She felt close to him at that time and was almost in love with him. Breanna said defendant drove a white 1998 Honda Civic.

Breanna testified that she and defendant were together the entire day of the murder. They were at her house in the evening, went to defendant's house around 7:00 p.m. to eat, then returned to her house after her grandparents had gone to bed. Defendant stayed overnight at her house and they both left the house together the next afternoon. The only reason she lied to the police about knowing defendant was because she was half-asleep and she did not want to talk to them at that hour.

Breanna had since moved to Indiana. When she moved, she left her notebook behind. Cindy discovered writing on the headboard in Breanna's room. It said, "RLOC," which Cindy believed identified defendant. There was similar writing on the footboard of the bed. On a nightstand drawer was the writing, "Breanna was here 12/2/04, loving RLOC Saesee."

At the time of trial, Breanna was 15 years old and pregnant by someone other than defendant.

### Rebuttal Evidence

The police gang expert, who was familiar with the local gang members, assisted the detectives with possible suspects on the night of the murder. She was given a description of a Hispanic male, possibly a Norteño, who identified himself as an "[O]G" from Hanford. The officer immediately thought of Benny. The second description she was given was of an Asian male, who was tall with a thin to medium build, who said, "this is [a] Crip block" during a turf argument with Lolo. The officer believed the suspect was an OT member, the tallest of whom was defendant. On the other hand, both Jack Noi and Peter Saesee were quite short.

The person identified from the photographic lineup by the young girl was only five feet one inches tall.

(Lod. Doc. 4, Opinion of the California Court of Appeal, Fifth Appellate District, at 3-10).

## DISCUSSION

### I.   Jurisdiction and Venue

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  While Petitioner is currently incarcerated in Pelican Bay State Prison,[2]

---

[2]Pelican Bay State Prison is located in Del Norte County, California, which falls within the jurisdiction of the Northern District of California. *See* 28 U.S.C. § 84(a).

1  Petitioner's custody arose from a conviction in the Tulare County Superior Court.  (Pet. at 2).  As

2  Tulare County falls within this judicial district, 28 U.S.C. § 84(b), the Court has concurrent

3  jurisdiction over Petitioner's application for writ of habeas corpus.  *See* 28 U.S.C. § 2241(d) (vesting

4  concurrent jurisdiction for an application for writ of habeas corpus to the district court where the

5  petitioner "is in custody or in the district court for the district within which the State court was held

6  which convicted and sentenced him" if the State "contains two or more Federal judicial districts").

7  **II.      ADEPA Standard of Review**

8         On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

9  1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

10 enactment.  *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499

11 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting *Drinkard v. Johnson*, 97

12 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by*

13 *Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)).  The

14 instant petition was filed in 2008 and is consequently governed by the provisions of the AEDPA,

15 which became effective April 24, 1996.  *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).

16        As Petitioner is in custody of the California Department of Corrections and Rehabilitation

17 pursuant to a state court judgment, 28 U.S.C. § 2254 remains the exclusive vehicle for Petitioner's

18 habeas petition.  *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-1127 (9th Cir.

19 2006) (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that, "[s]ection

20 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state

21 court judgment, even when the petitioner is not challenging his underlying state court conviction'").

22        Since Petitioner filed his petition after the effective date of AEDPA, his petition for habeas

23 corpus "may be granted only if he demonstrates that the state court decision denying relief was

24 'contrary to, or involved an unreasonable application of, clearly established Federal law, as

25 determined by the Supreme Court of the United States.'"  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir.

26 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see Lockyer*, 538 U.S. at 70-71.

27 \\\

28 \\\

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id*. (quoting *Williams*, 592 U.S. at 412).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id*.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Lockyer*, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).  Furthermore, AEDPA requires that we give considerable deference to state court decisions.  The state court's factual findings are presumed

1   correct. 28 U.S.C. § 2254(e)(1).  We are bound by a state's interpretation of its own laws.  *Souch v.*

2   *Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

3          The initial step in applying AEDPA's standards requires a federal habeas court to "identify

4   the state court decision that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091

5   (9th Cir. 2005).  Where more than one State court has adjudicated Petitioner's claims, the Court

6   analyzes the last reasoned decision.  *Id*. (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) for the

7   presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests

8   upon the same ground as the prior order).  Thus, a federal habeas court looks through ambiguous or

9   unexplained state court decisions to the last reasoned decision in order to determine whether that

10  decision was contrary to or an unreasonable application of clearly established federal law.  *Bailey v.*

11  *Rae*, 339 F.3d 1107, 1112-1113 (9th Cir. 2003).

12         Here, the California Court of Appeal and the California Supreme Court were the only courts

13  to have adjudicated Petitioner's first five claims.  As the California Supreme Court summarily

14  denied Petitioner's claims, the Court looks through those decisions to the last reasoned decision;

15  namely, that of the California Court of Appeal.  *See Ylst v. Nunnemaker*, 501 U.S. at 804.  Similarly,

16  the Tulare County Superior Court and the California Court of Appeal were the only courts to have

17  adjudicated Petitioner's last three claims.  As the appellate court issued a summary denial, the Court

18  assumes that the Court of Appeal's opinion is based on the same reasoning as set forth in the

19  Superior Court's opinion.  *Id*.

20  **III.     Review of Petitioner's Claim**

21         The instant petition for writ of habeas corpus contains eight grounds for relief: (1) the trial

22  court violated Petitioner's due process rights by failing to *sua sponte* issue limiting instructions after

23  allowing the introduction of co-defendant's guilty plea; (2) the trial court violated Petitioner's right

24  to a jury trial by failing to *sua sponte* instruct the jury on provocation; (3) the trial court violated

25  Petitioner's right to due process by giving an erroneous definition of malice; (4) Petitioner's Sixth

26  Amendment right to counsel was violated by trial counsel's promise during opening statements to

27  produce a corroborating witness; (5) trial court applied an incorrect standard of review in denying

28  Petitioner's motion for a new trial; (6) the prosecutor knowingly used perjured testimony; (7) trial

1   counsel's representation was deficient as counsel failed to move for bifurcation of the trial on the

2   charges related to the separate incidents; (8) the trial court erred in failing to instruct Petitioner of his

3   right to a bifurcated trial.

4          ***A.***     ***Ground One: Instruction Regarding Co-Defendant's Guilty Plea***

5         In the first ground for relief set forth in the petition for writ of habeas corpus, Petitioner

6   contends that the trial court violated his right to due process of the law by failing to issue a limiting

7   instruction regarding the admission of his co-defendant's guilty plea.  In response, Respondent

8   contends that this claim is procedurally defaulted, pointing to the California Court of Appeal's

9   decision which denied this claim on the grounds that Petitioner had waived this argument by failing

10  to object at trial.  The appellate court alternatively concluded that the claim failed on the merits as

11  Petitioner was not prejudiced by the trial court's failure to issue this instruction.

12        A claim is considered procedurally default where the state court invokes a state procedural

13  rule, which is adequate to support the judgment and independent of federal law, to reject a federal

14  claim.  *Coleman v. Thompson*, 501 U.S. 722, 729-730 (1991).  A state procedural rule is adequate if

15  the rule is sufficiently clear at the time of the default.  *Ford v. Georgia*, 498 U.S. 411, 423 (1991).

16  Additionally, the rule must be "firmly established and regularly followed" by the state court.  *Id.* at

17  424-425 (finding that rule announced at time of procedural default is not firmly established); *see*

18  *Wood v. Hall*, 130 F.3d 373, 377 (9th Cir. 1997) (stating that a rule is inadequate where the rule is

19  selectively applied, ambiguous, or unsettled in the state and is not inadequate merely because the rule

20  entails the exercise of judicial discretion).  The procedural rule is independent if it is not "interwoven

21  with the federal law."  *Michigan v. Long*, 463 U.S. 1032, 1040-1041 (1983); *see Morales v.*

22  *Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996) (quoting *Coleman*, 501 U.S. at 735 (quoting *Michigan*

23  *v. Long*, 463 U.S. at 1041), in stating "[f]ederal habeas review is not barred is the state decision

24  'fairly appears to rest primarily on federal law, or to be interwoven with the federal law'").

25        "[P]rocedural default does not bar consideration of a federal claim on either direct or habeas

26  review unless the last state court rendering a judgment in the case 'clearly and expressly' states that

27  its judgment rests on a state procedural bar."  *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quoting

28  *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)).  The fact that the State court went on to reach the

1   merits of Petitioner's case does not erase the procedural bar.  *See id*. at 264 n. 10 (stating that, "a

2   state court need not fear reaching the merits of a federal claim in an alternative holding.  By its very

3   definition, the adequate and independent state ground doctrine requires the federal court to honor a

4   state holding that is a sufficient basis for the state court's judgment, even when the state court also

5   relies on federal law").

6          As procedural default is an affirmative defense, Respondent bears the burden of pleading and

7   proving that the state procedural bar is adequate and independent while Petitioner bears the interim

8   burden of placing the adequacy of the defense at issue.  *Royal v Kernan*, 2009 WL 1034502, *12

9   (E.D. Cal. 2009) (citing *Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003)).  Here, Respondent

10  has met that burden by pleading that this claim is procedurally defaulted under California's

11  contemporaneous objection rule.  (Answer at 17-18).  As Respondent notes, the contemporaneous

12  objection rule has been found by the Ninth Circuit to be independent and adequate.  *See Melendez v.*

13  *Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002); *see also Rich v. Calderon*, 187 F.3d 1064, 1069-1070

14  (9th Cir. 1999).  Thus, the burden has shifted to Petition to place the adequacy of the

15  contemporaneous objection rule into question as "the scope of the state's burden of proof thereafter

16  will be measured by the specific claims of inadequacy put forth by the petitioner."  *Bennett*, 322 F.3d

17  at 584-85.  Here, Petitioner did not reply to Respondent's answer and thus there are no "specific

18  allegations by the petitioner as to the adequacy of the state procedure."  *Id*.  Petitioner has failed to

19  satisfy his interim burden under *Bennett* and the Court must conclude that the contemporaneous

20  objection rule rests on an adequate and independent state procedural ground.  Consequently, a federal

21  habeas court is barred from reviewing Petitioner's claim unless Petitioner can demonstrate cause and

22  actual prejudice or that failure to review Petitioner's claims is necessary to avoiding a miscarriage of

23  justice.  *Coleman*, 501 U.S. at 725; *Bradshaw v. Richey*, 546 U.S. 74, 79-80 (2005).

24          "'[T]he existence of cause for a procedural default must ordinarily turn on whether the

25  prisoner can show that some objective factor external to the defense impeded counsel's efforts to

26  comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (finding

27  cause is established by ineffective assistance of counsel but that principles underlying exhaustion

28  requires that the ineffective assistance of counsel claim be raised to state court) (hereinafter

1   "*Murray*"); *see Stickler v. Greene*, 527 U.S. 263, 283 n. 24 (1999) (finding cause where the failure

2   to raise a claim resulted from conduct attributable to the prosecutor that impeded trial counsel's

3   access to the factual basis for the claim); *see also McCleskey v. Zant*, 499 U.S. 467, 493-494 (1991)

4   (finding that objective factors that may constitute cause include interference by officials that would

5   make assertion of the claim impracticable, a showing that the factual or legal basis for the claim was

6   not reasonably available, or constitutionally ineffective assistance of counsel under the Sixth

7   Amendment). Here, Petitioner has not shown any cause for his procedural default as his claims

8   regarding ineffective assistance of counsel do not pertain to the failure to object to the admission of

9   his co-defendant's guilty plea, the legal and factual basis for the claim was reasonably available to

10  Petitioner during trial, and Petitioner has failed to offer any other rationale for his failure to object at

11  trial.

12          As Petitioner has not established cause for his failure to object, the Court does not need to

13  consider whether Petitioner can demonstrate that he would be prejudiced by the procedural default.

14  *McCleskey*, 499 U.S. at 502 (citing *Murray*, 477 U.S. at 494); *see also Smith v. Murray*, 477 U.S.

15  527, 533-534 (1986) (noting that the court need not determine whether a petitioner had suffered

16  prejudice as it was "self-evident" that the petition had not demonstrated cause); *see also Cook v.*

17  *Schriro*, 538 F.3d 1000, 1028 n. 13 (9th Cir. 2008) (citing to *Engle v. Isaac*, 456 U.S. 107, 134 n. 43

18  (1982) for the proposition that a court need not consider whether a petitioner suffered actual

19  prejudice where the petitioner cannot show cause). Even if Petitioner had established cause, the

20  Court finds that Petitioner did not suffer prejudice arising from the procedural default as no prejudice

21  resulted from the trial court's failure to issue a limiting instruction. As noted by the California Court

22  of Appeal, both sides at trial limited their usage of the guilty plea entered into by Petitioner's co-

23  defendant to issues pertaining to co-defendant's credibility. More importantly, the prosecutor's

24  statements and questioning did not infer a connection between the co-defendant's guilty plea and

25  Petitioner's guilt.

26          "Even if a state prisoner cannot meet the cause and prejudice standard, a federal court may

27  hear the merits of [a defaulted claim] if the failure to hear the claim[s] would constitute a

28  'miscarriage of justice.'" *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992); *see also Schlup v. Delo*, 513

1   U.S. 298, 321 (1995) (reiterating exception for fundamental miscarriage of justice but noting that

2   exception is explicitly tied to petitioner's innocence).  Thus, "[t]o qualify for the 'fundamental

3   miscarriage of justice' exception to the procedural default rule, however, [Petitioner] must show that

4   a constitutional violation has 'probably resulted' in the conviction when he was 'actually innocent'

5   of the offense." *Cook*, 538 F.3d at 1028 (quoting *Murray*, 477 U.S. at 496).  Here, Petitioner does

6   not claim actual innocence nor does he produce evidence that would permit this Court to come to

7   such a conclusion.  Consequently, the Court finds that Petitioner's claim is procedurally defaulted

8   and federal review of the claim is foreclosed.

9           ***B.      Ground Two: Failure to Sua Sponte Issue Jury Instruction on Provocation***

10          In his second ground for relief, Petitioner contends that the trial court's failure to *sua sponte*

11  issue a jury instruction on provocation was both prejudicial error and a violation of his constitutional

12  right to a jury trial.  The California Court of Appeal rejected Petitioner's claim on the merits, noting

13  that the California Supreme Court had found that such an instruction was not required to be given by

14  the trial court on it's own motion and that the evidence produced at Petitioner's trial did not warrant

15  the issuance of this instruction.

16          Generally, claims based on instructional error under state law are not cognizable on habeas

17  corpus review.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459

18  U.S. 422, 438 n. 6 (1983)).   Thus, to obtain federal collateral relief for errors in the jury charge, a

19  petitioner must show that the error so infected the entire trial that the resulting conviction violates

20  due process.  *Estelle*, 502 U.S. at 72; *see Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting

21  *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) in finding that a habeas court must not merely

22  consider whether an "instruction is undesirable, erroneous, or even universally condemned" but must

23  instead determine "'whether the ailing instruction by itself so infected the entire trial that the resulting

24  conviction violates due process'").

25          However,  as noted by the Ninth Circuit recently "'[f]ailure to instruct on the defense theory

26  of the case is reversible error if the theory is legally sound and evidence in the case makes it

27  applicable.'" *Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009) (quoting *Beardslee v. Woodford*, 358

28  F.3d 560, 577 (9th Cir. 2004) (citation omitted)).  Nevertheless, a habeas petitioner challenging the

1  omission of a jury instruction bears an "especially heavy" burden of showing prejudice as omissions

2  are less likely to be prejudicial than an affirmative misstatement of law.  *Henderson*, 431 U.S. at 155;

3  *Clark v. Brown*, 450 F.3d 898, 905 (9th Cir. 2006) (stating that in order to obtain habeas relief, a

4  petitioner "must show that the alleged instructional error had substantial and injurious effect or

5  influence in determining the jury's verdict") (citations and internal quotation marks omitted); *see*

6  *also Beardslee*, 358 F.3d at 578.  "A substantial and injurious effect means a reasonable probability

7  that the jury would have arrived at a different verdict had the instruction been given.  To decide

8  whether [Petitioner] was prejudiced, we consider: (1) the weight of evidence that contradicts the

9  defense; and (2) whether the defense could have completely absolved the defendant of the charge."

10  *Byrd*, 566 F.3d at 860 (quoting *Clark*, 450 F.3d at 916 and citing *Beardslee*, 358 F.3d at 578)

11  (citation and internal quotation marks omitted).

12        Petitioner has failed to meet the heavy burden required for establishing a constitutional

13  violation as he has not proven that the failure to issue the instruction resulted in substantial and

14  injurious effect on the verdict.  As noted by the California Court of Appeal, Petitioner's defense at

15  trial was that he was not the perpetrator.  (Lod. Doc. 4 at 16).  Consequently,  the issuance of a jury

16  instruction regarding provocation was not applicable as the evidence presented by the defense did not

17  warrant the instruction.  (Id).  Thus, the error complained of by Petitioner does not constitute a

18  failure to instruct on the defense theory.  Furthermore, as the instruction was irrelevant to Petitioner's

19  defense, the Court fails to see how the instruction could have resulted in a substantial and injurious

20  effect on the verdict.  Consequently, the Court finds that Petitioner cannot obtain habeas corpus relief

21  on this ground.

22        **C.      Ground Three: Erroneous Jury Instruction Regarding Malice**

23        In his third ground for relief, Petitioner claims that the trial court violated his constitutional

24  rights by issuing a jury instruction with an erroneous definition of malice.  (Pet. at 9).  The trial court

25  instructed the jury with two different definitions of malice, contained in CALCRIM Nos. 520 and

26  965.  (CT, Vol. 2, 390, 415).  Petitioner contends that the trial court's issuance of CALCRIM 965,

27  defining malice in a non-homicide context, violated his constitutional rights since the trial court

28  failed to tell the jury which definition of malice pertained to which crime; therefore, permitting the

1    jury to apply the definition of malice contained in CALCRIM No. 965 to the homicide charge.  (Lod.

2    Doc. 11 at 21-23).

3         An erroneous jury instruction "directed toward an element of the offense may rise to the level

4    of a constitutional defect."  *Byrd*, 566 F.3d at 862 (citing *Neder v. United States*, 527 U.S. 1, 9-10

5    (1999)).  "Due process requires that jury instructions in criminal trials give effect to the prosecutor's

6    burden of proving every element of the crime charged beyond a reasonable doubt. [Citation]

7    'Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level

8    of a due process violation.'"  *Townsend v. Knowles*, 562 F.3d 1200, 1209 (9th Cir. 2009) (quoting

9    *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam)).  As noted above, federal collateral

10   relief for errors in the jury charge requires that a petitioner demonstrate that the erroneous instruction

11   infected the entire trial such that the resulting conviction violated due process and rendered the trial

12   fundamentally unfair.  *See Estelle*, 502 U.S. at 72.  "The jury instruction may not be judged in

13   artificial isolation, but must be considered in the context of the instructions as a whole and the trial

14   record."  *Id*. (citation and internal quotation marks omitted).  "If the charge as a whole is ambiguous,

15   the question is whether there is a reasonable likelihood that the jury has applied the challenged

16   instruction in a way that violates the Constitution."  *Middleton*, 541 U.S. at 437.

17        Here, the appellate court found that "[t]here is simply no reasonable possibility the jurors

18   were mislead by the two definitions."  (Lod. Doc. 4 at 18).  The California Court of Appeal noted

19   that while there were two definitions of malice provided in the jury charge, each pertained to a

20   charged crime and "[e]ach definition was contained specifically within the different instructions for

21   the two separate crimes.  The written instructions were on two different pages with two different

22   titles, separated by about 13 other instructions.  When given orally, the instructions were further

23   separated in time by the attorney's arguments."  (Id. at 17-18).  The Court finds the reasons set forth

24   by the State appellate court compelling.  Thus, even assuming that the jury instruction as a whole

25   was ambiguous, there was no reasonable likelihood that the jury applied the wrong definition of

26   malice as to the murder charge.  Consequently, the Court recommends that the state court's decision

27   was not objectively unreasonable and that this ground for relief should be denied.

28   \\\

**D.    *Ground Four: Ineffective Assistance of Counsel Regarding Opening Statement***

As his fourth ground for relief, Petitioner contends that trial counsel violated his constitutional rights by rendering him ineffective assistance of counsel.  Specifically, Petitioner points to counsel's promise during opening statements that his alibi witness's testimony would be corroborated by the witness's grandfather and counsel's subsequent failure to fulfill this promise as unconstitutionally deficient.  (Pet. at 10).

Generally, ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of 28 U.S.C. § 2254(d).  *Weighall v. Middle*, 215 F.3d 1058, 1061-1062 (9th Cir. 2000).  For the purposes of habeas cases governed by 28 U.S.C. § 2254(d), the law governing ineffective assistance of counsel claims is clearly established.  *Canales v. Roe*, 151 F.3d 1226, 1229 (9th Cir. 1998).  An allegation of ineffective assistance of counsel requires that a petitioner establish two elements–(1) counsel' s performance was deficient and (2) petitioner was prejudiced by the deficiency.  *Strickland v. Washington*, 466 U.S. 668, 687(1984); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994).   Under the first element, Petitioner must establish that counsel's representation fell below an objective standard of reasonableness, specifically identifying alleged acts or omissions which did not fall within reasonable professional judgment considering the circumstances.  *Strickland*, 466 U.S. at 688; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential and there exists a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 687; *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

Secondly, Petitioner must show that counsel's errors were so egregious that Petitioner was deprived of the right to a fair trial, namely a trial whose result is reliable.  *Strickland*, 466 U.S. at 687.   To prevail on the second element, Petitioner bears the burden of establishing that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Quintero-Barraza*, 78 F.3d at 1348 (quoting *Strickland*, 466 U.S. at 694).  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the Petitioner as a result of the alleged deficiencies.  *Strickland*, 466 U.S. at

697.  Since prejudice is a prerequisite to a successful claim of ineffective assistance of counsel, any deficiency that was not sufficiently prejudicial to Petitioner's case is fatal to an ineffective assistance of counsel claim.  *Id.*

During opening arguments, counsel expounded on the existence of an alibi witness, Breanna. Counsel noted that while Petitioner had told the police that he had been with Breanna at the time of the shooting of Lolo,  Breanna denied knowing the Petitioner when the police initially questioned her.  Counsel explained that her previous statement to the police was born out of a fear of her family's finding out about her sexual relationship with Petitioner.  Counsel then made the following comments:

> What about the girl, is that it.  Is that enough to plant a seed of reasonable doubt in your mind when you judge this boy?
> *Well, we found out that there's an old man, Long Shio Saechao  Somebody's grandpa was in that house the night [ defendant ] came over. As a matter of fact, he held [ sic ] him through a window. As a matter of fact, he fed him a dish of noodles. He was mad as hell that the girl told the police. He was mad as hell that she was subpoenaed to be here. I'm counting on him to tell the truth and corroborate what the girl said.*

(RT, Vol. 1, at 29).

The California Court of Appeal found Petitioner erroneously characterized trial counsel's statement during opening as a promise, explaining that:

> This excerpt demonstrates defense counsel's statement that he was counting on the grandfather's truthful corroboration in no way amounted to a promise that he would produce the grandfather as a witness. In fact, counsel stressed to the jury that the grandfather was "mad as hell" Breanna had spoken to the police and had been subpoenaed to testify. Nothing here suggested the grandfather would be a willing or cooperative defense witness who would appear and testify favorably, and nothing suggested defense counsel had any reason to count on the grandfather as a witness. Defendant mischaracterizes defense counsel's statements.

(Lod. Doc. 4 at 20).

Furthermore, the appellate court found that no prejudice arose from counsel's statement as even a promise of a corroborating witness would not have hurt the defense.  The Court does not find that the appellate court unreasonably applied *Strickland*.  While the statement made by Petitioner's trial counsel may be construed as a promise to produce the grandfather, the statements are not so clear cut that the State court's finding, that there was no promise, was objectively unreasonable.

\\\

1    Additionally, even if the statement were construed as a promise, the Court does not find that

2    this error prejudiced defendant such that there is a reasonable probability the result would have been

3    more favorable to Petitioner.  Initially, the Court notes that the jury was instructed that, "[n]either

4    side is required to call all witnesses who may have information about the case."  (RT, Vol. 4, at 456).

5    Additionally, the paragraph regarding the grandfather's testimony was brief, constituting seven

6    sentences in a four page long opening statement.  (RT, Vol. 1, at 25-29).  The ambiguity as to

7    whether the statement was a promise to produce the grandfather, discussed above, also lessens the

8    prejudicial impact of the claim error as it would not have been certain to a jury that the grandfather

9    would have testified.  Lastly, Petitioner has provided no evidence as to what the grandfather would

10   have testified and thus the probative value of the grandfather's testimony would be merely

11   speculative.

12    Even assuming the grandfather would have testified according to what was outlined by trial

13   counsel in opening statements, the grandfather would have merely corroborated the alibi provided by

14   Breanna, making his testimony cumulative to what another witness attested to.  Thus, Petitioner's

15   case is distinct from several cases in which other courts have found that an unfulfilled promise made

16   in opening statement could constitute ineffective assistance of counsel.  *See Madrigal v. Yates*,

17   __F.Supp.2d__, 2009 WL 2916808, *17-19 (C.D. Cal. 2008) (noting that "there are no Ninth Circuit

18   Court of Appeals cases directly addressing the issue of ineffective assistance of counsel arising from

19   a broken promise that defendant will testify" and finding persuasive *Hampton v. Leibach*, 347 F.3d

20   219, 259 (7th Cir. 2003) (finding that promising that defendant would testify as to his innocence and

21   then failing to fulfil the promise constituted ineffective assistance of counsel) and *Ouber v. Guarino*,

22   293 F.3d 19, 27 (1st Cir. 2002) (finding ineffective assistance of counsel where counsel promised

23   that jurors would hear from defendant what had happened but counsel later advised defendant not to

24   testify)).  Rather, the Court finds this case to be more analogous to *United States v, Ailemen*, 2008

25   EL 5427600, *12 (N.D. Cal. 2008), in which a district court found that the failure to produce

26   evidence promised in opening statements was not prejudicial where such evidence would have

27   merely shored up the defense's theory.  *See also Mann v. Ryan*, 2009 WL 2450473 (D. Ariz. 2009)

28   (citing *Barrows v. Uchtman*, 398 F.3d 597, 606 (7th Cir. 2005) in noting that *Hampton* and *Ouber*

applied to cases where counsel promised that defendant would testify). Here, the jury heard from Breanna that Petitioner was with her at the time of Lolo's shooting, rendering the grandfather's testimony cumulative. District courts have found that where "the promised testimony would have been cumulative and would not have undermined the prosecution's evidence" an unfulfilled promise would not constitute ineffective assistance of counsel. *Bhatia v. United States*, 2009 WL 690810 (N.D. Cal. 2009) (citing to *United States v. McGill*, 11 F.3d 223, 227-228 (1st Cir. 1993) and *Hampton*, for the proposition that a failure to produce a promised witness may amount to ineffective assistance of counsel in some circumstances but noting that those cases were inapplicable as the witness was not central to the defendant's defense). Consequently, the Court finds that the state court's decision was not an objectively unreasonable application of *Strickland* and recommends that the claim be denied.

### E.   Ground Five: Trial Court's Denial of Motion for New Trial

Petitioner contends that the trial court applied an erroneous standard in ruling on Petitioner's motion for a new trial. After the jury reached its verdict, Petitioner motioned for a new trial based on sufficiency of the evidence grounds. The trial court denied the motion finding that there was sufficient evidence to support the conviction.

Respondent argues that the instant claim does not raise a cognizable constitutional claim under section 2254 as it fails to present a federal question. The Court finds Respondent's argument persuasive as the petition fails to set forth what constitutional rights have been violated and which clearly established Supreme Court precedent would permit relief for a federal habeas petitioner based on the State's denial of a new trial. Rather, Petitioner's argument seems to be that the trial court failed to adhere to the State law in deciding the motion, an argument soundly rejected by the California Court of Appeal on direct review of Petitioner's claims.

Even if Petitioner's is correct that the trial court erred or abused its discretion in denying Petitioner's motion for a new trial, "[f]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780(1990)). As the Supreme Court in *Estelle* noted, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is

1    limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United

2    States." *Id.* at 67-68.  Consequently, "[a] state court's procedural or evidentiary ruling is not subject

3    to federal habeas review unless the ruling violates federal law, either by infringing upon a specific

4    federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair

5    trial guaranteed by due process." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  Here,

6    Petitioner alleges neither that the denial violated a specific constitutional right nor that he was

7    deprived of a fundamentally fair trial.  Regardless of Petitioner's failure to raise a federal

8    constitutional violation, the Court finds that Petitioner's basis in motioning for a new

9    trial–specifically, insufficient evidence in light of the inconsistent testimony between certain

10   prosecution witnesses–unavailing.  Thus, the Court finds that Petitioner is not entitled to relief on

11   this claim.

12           **F.       Ground Six: Prosecutor's Knowing Use of Perjured Testimony**

13           In his Sixth Ground for relief, Petitioner contends that the prosecutor knowingly used

14   perjured testimony.  Petitioner claims that prosecution witness, Juanita Aguilar, falsely testified that

15   she lived across the street from Petitioner when in fact she lives several blocks away. (Pet. at 13).

16           Respondent correctly notes that this claim is unexhausted as Petitioner never raised this claim

17   to the California Supreme Court.  (Answer at 25-26; see Lod. Doc. 13, Pet. for Review).  A habeas

18   petitioner must exhaust his state remedies in order to obtain habeas corpus relief.  28 U.S.C. §

19   2254(b)(1)(A) (stating, "[a]n application for a writ of habeas corpus on behalf of a person in custody

20   pursuant to the judgment of a State court shall not be granted unless it appears that...the applicant has

21   exhausted the remedies available in the courts of the State").  The exhaustion of state remedies

22   requires habeas petitioners to fairly present all claims to "each appropriate state court (including a

23   state supreme court with powers of discretionary review)."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)

24   (noting that fair presentation requires that the claim itself alert the state court of the federal nature of

25   the claim); *Duncan v. Henry*, 513 U.S. 364, 365(1995) (per curiam) (quoting *Picard v. Connor*, 404

26   U.S. 270, 275 (1971) in stating, "exhaustion of state remedies requires that petitioners 'fairly

27   presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon

28   and correct' alleged violations of its prisoners' federal rights'").  Here, Petitioner failed to present

1  this claim in any form to the California Supreme Court; thus, Petitioner has failed to exhaust his

2  claim and may not obtain habeas corpus relief on this ground.

3        Alternatively, the Court denies Petitioner's claim on the merits. *See* 28 U.S.C. § 2254(b)(2)

4  ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the

5  failure of the applicant to exhaust the remedies available in the courts of the State").  Petitioner

6  alleges that the prosecutor knowingly presented perjured testimony. (Pet. at 13).  The knowing use of

7  perjured testimony against a defendant to obtain a conviction is unconstitutional. *Napue v. Illinois*,

8  360 U.S. 264, 269 (1959); *see Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (holding that

9  prosecutor's use of perjured testimony and deliberate suppression of impeachment evidence

10  constitutes a denial of due process); *see also Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002)

11  (as amended) (stating that prosecutor "has a constitutional duty to correct evidence he or she knows

12  is false, even if it was not intentionally submitted").  Thus, a conviction obtained through the use of

13  testimony that a prosecutor knows or should have known is perjured must be set aside where there is

14  any reasonable likelihood that the perjured testimony could have affected the judgment of the jury.

15  *United States v. Agurs*, 427 U.S. 97, 103 (1976).

16        To prevail on this claim, Petitioner is required to show that: (1) the testimony (or evidence)

17  was actually false;  (2) the prosecutor knew or should have known that the testimony was actually

18  false; and (3) that the false testimony was material.  *United States v. Zuno-Arce*, 339 F.3d 886, 889

19  (9th Cir. 2006) (citing *Napue*, 360 U.S. at 269-71); *see Morales v. Woodford*, 336 F.3d 1136, 1152

20  (9th Cir. 2003) (stating that in order to succeed on such a claim, a habeas petitioner must first show

21  that the testimony or evidence testimony was actually false, and then show that the prosecutor was

22  aware of the falsity).  Here, Petitioner has made only conclusory allegations regarding the falsity of

23  Juanita Aguilar's testimony and the prosecutor's knowledge of that falsity as such allegations are

24  wholly unsupported by the record.  *See Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (finding

25  that conclusory suggestions that a petitioner's appellate counsel provided ineffective assistance fall

26  far short of stating a valid claim of a constitutional violation).  In fact, the record shows that

27  Petitioner's claim misconstrues the testimony of Junita Aguilar.  Aguilar testified that she recognized

28  Petitioner's vehicle not because Petitioner lived across the street from her but because he "would

1  visit across the street from [her]." (RT, Vol. 3, 335).  She later testified on cross examination that

2  "[Petitioner] lives around the corner." (RT, Vol. 3, at 353).  The Court's review of the record reveals

3  that Petitioner's assertion, that Aguilar testified that she lives across the street from him, is patently

4  false.  For the reasons stated above, the Court finds this ground is without merit.

5         **G.      Ground Seven: Ineffective Assistance of Counsel Regarding Motion to Bifurcate**

6         Petitioner contends that his Sixth Amendment right to counsel was violated by trial counsel's

7  defective performance.  More specifically, Petitioner points to counsel's failure to motion to

8  bifurcate the trial on three counts, stemming from two separate incidents. (Pet. at 14).  Respondent

9  points out that this claim is unexhausted as Petitioner never raised this claim to the California

10 Supreme Court.  (Answer at 27; see Lod. Doc. 13, Pet. for Review).  A habeas petitioner must

11 exhaust his state remedies in order to obtain habeas corpus relief; therefore, this claim does not

12 afford Petitioner the relief he is seeking.  28 U.S.C. § 2254(b)(1)(A).

13        Despite Petitioner's failure to exhaust a claim, this Court may deny the claim on the merits.

14 *See* 28 U.S.C. § 2254(b)(2).  Here, the Court finds Petitioner's argument unavailing as Petitioner is

15 unable to show that he would have prevailed on a motion to bifurcate the trial.  *See Lopez v. Clark*,

16 2009 WL 3417784, *8-9 (C.D. Cal. 2009) (citing *People v. Calderon*, 9 Cal.4th 69, 72, 74-75 (Cal.

17 1994), in noting that California law does not statutorily mandate bifurcation and vests in the trial

18 court broad discretion regarding bifurcation); *see also Penn v. Kramer*, 2007 WL 4219441, *19

19 (E.D. Cal. 2007) (noting wide discretion of trial court to consolidate counts).  In light of the broad

20 discretion a trial court possesses in deciding whether to grant a motion, Petitioner cannot succeed in

21 proving that he was prejudiced as Petitioner has failed to produce any evidence indicating that the

22 trial court would have exercise such discretion in favor of Petitioner.  Additionally, even if Petitioner

23 had prevailed on the motion for bifurcation, Petitioner has failed to demonstrate that there exists a

24 reasonable probability that the jury would have reached a more favorable verdict in a bifurcated

25 proceeding.  Consequently, Petitioner's claim should be denied on the merits.

26        **H.      Ground Eight: Trial Court's Failure to Inform Petitioner of Right to Bifurcation**

27        Similar to Ground Seven, Petitioner contends that the trial court's failure to *sua sponte*

28 instruct Petitioner that he has the right to a bifurcated trial was erroneous. (Pet. at 15).  Respondent

1  correctly points out that this claim was also not submitted to the California Supreme Court and thus

2  cannot provide Petitioner with the relief he seeks.  (Answer at 29-30).

3         Regardless, the Court recommends the denial of Petitioner's claim for relief.  *See* 28 U.S.C. §

4  2254(b)(2).  Here, Petitioner argues that the trial court erred in failing to instruct him that he had a

5  right to bifurcate the trial on the separate charges against him.  However, Petitioner cites no Supreme

6  Court or federal authority that imparts on Petitioner this right, much less any authority that would

7  impose a duty on the trial court to *sua sponte* instruct Petitioner of such a right.  While joinder of

8  charges violates due process where the joinder was so prejudicial that the trial court should have

9  ordered a separate trial, *Fuller v. Roe*, 182 F.3d 699, 703 (9th Cir. 1999), *abrogated on other*

10  *grounds by Slack v. McDaniel*, 529 U.S. 473 (2000), relief will be granted only if a petitioner can

11  show that "the impermissible joinder had a substantial and injurious effect or influence in

12  determining the jury's verdict."  *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000) (citing

13  *Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir. 1998)).  In *Bean*, the Ninth Circuit noted that,

14  "prejudice generally does not arise from joinder when the evidence of each crime is simple and

15  distinct."  *Id*. at 1085.  Here, Petitioner has not made the requisite showing of prejudice and the

16  Court finds that Petitioner cannot make such a showing as evidence of the murder and the shooting

17  at a dwelling/inhabited vehicle were simple and distinct.  Consequently, the Court recommends that

18  this ground for relief be denied on the merits.

19                                    **RECOMMENDATION**

20         Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

21  DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

22  Respondent.

23         This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

24  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

25  of the Local Rules of Practice for the United States District Court, Eastern District of California.

26         Within thirty (30) days after being served with a copy, any party may file written objections

27  with the court and serve a copy on all parties.  Such a document should be captioned "Objections to

28  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

1   filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.

2   The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The

3   parties are advised that failure to file objections within the specified time may waive the right to

4   appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

5

6   IT IS SO ORDERED.

7   **Dated:   November 17, 2009          /s/ John M. Dixon**
                                    UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28